NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2018-0651


WEARE BIBLE BAPTIST CHURCH, INC.

v.

CALVIN F. FULLER;

WEARE BIBLE BAPTIST CHURCH

v.

LELAND QUIMBY & a.

Argued: October 23, 2019
Opinion Issued: December 13, 2019

Upton & Hatfield, LLP, of Concord (Susan Aileen Lowry on the brief and orally), for plaintiffs Weare Bible Baptist Church and Calvin Fuller.

Sommers Law, PLLC, of Bedford (Eric M. Sommers on the brief and orally), for defendants Evelyn Quimby, Susan Quimby, and Christopher Quimby.

DONOVAN, J.  The defendants, Evelyn Quimby, Susan Quimby, and Christopher Quimby, appeal orders of the Superior Court (Brown, J.) denying their motion to dismiss the Weare Bible Baptist Church's motion for contempt, finding the defendants in contempt, and imposing additional obligations upon the defendants.  On appeal, the defendants argue that the trial court: (1) erred in denying their motion to dismiss because the Church's contempt motion failed to identify a clear directive of the court that the defendants violated; (2) committed an unsustainable exercise of discretion in finding the defendants in contempt in the absence of a clear directive in the underlying order; and (3) lacked subject matter jurisdiction to render its findings and rulings because doing so required the court to consider ecclesiastical matters of the Church.  Because the Church's contempt motion asks the court to rule on ecclesiastical matters, we reverse the trial court's denial of the defendants' motion to dismiss and vacate and remand the trial court's additional rulings.

I. Facts

The following facts are taken from the trial court's orders or are otherwise supported by the record.  In 1985, Leland Quimby, the patriarch of the defendants' family, became the pastor of the Church.  In 2014, after Leland suffered a stroke, the defendants decided to find an interim pastor.  They considered Calvin F. Fuller to fill this position and met with him to discuss his potential role at the Church.  Shortly thereafter, the entire Church membership voted to invite Fuller and his wife to become members of the Church and to appoint Fuller as pastor.

Thereafter, Fuller invited new members to join the Church, took several actions relating to the administration of the Church and its finances, amended the Church's corporate charter, and replaced the members of the corporate board.  Subsequently, the defendants filed an action on behalf of the Church seeking to void the memberships of Fuller, his wife, and the new members he invited to join the Church, and the official acts Fuller took as pastor, due to an alleged failure to comply with the corporate charter.[1]

The Church's corporate charter contains its covenant and articles of faith and governance.  It first describes the Church's purpose to, inter alia, "preach[] and teach[] the Word of God, which includes the corporate worship of Almighty God," and sets forth the Church's articles of faith and covenant, which describe in detail the beliefs of the Church according to its interpretation of biblical scripture.  The charter then sets forth the Church's rules pertaining to its membership and governance.  It describes the Church's membership as

---

[1] Leland Quimby took part in initiating this action, and the Church's subsequent motion for contempt includes him as an alleged contemnor.  According to the defendants, he died during the pendency of this litigation.  He is thus not a party to this appeal.

2

consisting of persons who give "evidence of regeneration by personal faith in Jesus Christ as Savior," have been "baptized by immersion," and "accept the doctrines, the Covenant, and the by-laws" of the charter. To become a member, a person must be admitted "by profession of faith having been previously baptized" or "by letter from another church of like faith and practice," must appear before the pastor and board of elders for "examination of qualifications and for instruction," and must be "received upon the recommendation of the Board of Elders and the vote of the Church." To become a pastor, a person must be elected by the Church membership. However, eligibility for the position requires that the person be a Church member in good standing for at least one year, unless a waiver of the one-year requirement is granted by the Advisory Board and two-thirds vote of the Church where a new member "has demonstrated an outstanding testamony [sic] and desire to serve the Lord."

Following a bench trial, the trial court issued a final order in February 2016 (2016 order) in which it concluded that: (1) Fuller was duly elected as pastor with full authority; (2) Fuller, his wife, and the other new members of the Church were properly admitted; and (3) certain "official acts" taken by Fuller and the defendants following Fuller's appointment were invalid for failure to follow the procedures set forth in the Church's corporate charter. The trial court reached its conclusions by determining whether, based upon the evidence at trial, members of the Church complied with the Church corporate charter procedures. The trial court also considered expert testimony on Baptist church polity in determining the validity of Fuller's appointment as pastor. The 2016 order set forth only one prospective directive: "The current membership of the church shall vote to ratify or reject any and all applicable actions taken by the Quimbys and [Fuller] during this time" with adequate notice in compliance with the corporate charter.

During service on March 27, 2016, Fuller announced that he had scheduled a meeting for April 3, 2016, to hold a vote contemplated by the 2016 order. At the April 3 meeting, Fuller led the Church members in voting on a number of issues. Throughout the meeting, Susan Quimby loudly objected and talked over Fuller. She also told other members of the Church that they would be in violation of the court's order if they participated in the vote. Despite this interference, the other members of the Church who attended the meeting cast their votes.

The defendants engaged in other behavior following the 2016 order that exacerbated the conflict among the Church membership. Evelyn and Leland Quimby, who had been living in the Church's parsonage at the time Fuller was elected pastor, continued to reside there, which resulted in the Church's loss of its tax-exempt status with the Town of Weare. The defendants also placed stakes in the yard around the parsonage which prevented others from entering, claiming that the property belonged to them. Additionally, they continued to

hold a hunter safety course at the parsonage after the Church voted to discontinue it.

The defendants also took actions directed against other members of the Church. They signed and distributed a petition to discipline Fuller, his wife, and other members of the Church for allegedly violating the corporate charter and participating in the April 2016 meeting. The defendants then held a meeting not attended by any other member at which they voted to dismiss the members named in their petition for discipline. Christopher Quimby and his brother mailed letters to those members stating that they had been dismissed and notified the Secretary of State of these changes. They also sent a letter to Fuller "accepting" his termination as pastor and his transfer to another church where he had been working, and later sent another letter to him demanding the return of all church property. The corporate seal appeared on all correspondence, which Christopher's brother signed as corporate treasurer despite the fact that the Church membership had elected another individual to that position at the April 2016 meeting.

The Church filed a petition for declaratory and injunctive relief against the defendants. The Church requested a declaration that the April 2016 meeting was held in accordance with the 2016 order and the Church's corporate charter, and an injunction to prevent the defendants from using, possessing, and occupying Church property, holding themselves out as individuals authorized to act on behalf of the Church, and acting on behalf of the Church without authority. The Church also filed a motion for contempt, requesting that the trial court find the defendants in contempt of the 2016 order and order them to comply with its rulings. The defendants filed a motion to dismiss the contempt motion, which the trial court denied.

The trial court held a three-day evidentiary hearing during which it intended to resolve the Church's petition for declaratory and injunctive relief and motion for contempt. Following the hearing, the trial court issued an order addressing only the Church's contempt motion (contempt order), in which it concluded that the defendants had "disrupted the orderly operation of the church, undermined Pastor Fuller's authority, and exposed the church to needless expenses, including property taxes." It ruled that Fuller "remains pastor" of the Church and that the ballot measures approved by Church membership at the April 2016 meeting "stand," while the defendants' actions "were contrary to the corporate charter and invalid."

The court further concluded that the defendants' continued residence in the parsonage was unlawful and "ripe for an eviction process," and ordered them to pay all property taxes imposed on the Church from the date of the 2016 order to the date of their departure from the premises, pay the Church a fine of $500 per month until they vacated the parsonage, and turn over the corporate seal and all corporate records in their possession. The court also

4

awarded attorney's fees and costs to the Church, stating that the proceedings were unnecessarily caused by the defendants' "direct contravention of both the letter and spirit of the Court's order . . . ." See Harkeem v. Adams, 117 N.H. 687, 690-91 (1977). The court noted that it believed its contempt order resolved all the issues raised in the Church's petition for declaratory and injunctive relief, and therefore concluded that no further action was necessary. This appeal followed.

## II. Analysis

We begin with the defendants' claim that the trial court erred when it denied their motion to dismiss. In reviewing a trial court's ruling on a motion to dismiss, we consider whether the allegations in the pleadings are reasonably susceptible of a construction that would permit recovery. Clark v. N.H. Dep't of Emp't Sec., 171 N.H. 639, 645 (2019). We assume the pleadings to be true and construe all reasonable inferences in the light most favorable to the plaintiff. Id. We then engage in a threshold inquiry that tests the facts in the complaint against the applicable law. Id. When the facts alleged by the plaintiff are reasonably susceptible of a construction that would permit recovery, we will uphold the denial of a motion to dismiss. In the Matter of Sawyer & Sawyer, 161 N.H. 11, 14-15 (2010).

In this case, the trial court should have dismissed the contempt motion because it required the court to inquire into ecclesiastical matters, which is forbidden by the First Amendment and thus falls outside of the court's jurisdiction. See Reardon v. Lemoyne, 122 N.H. 1042, 1047 (1982). The First Amendment, as applied to the states through the Fourteenth Amendment, requires us to maintain the separation of church and State. Id. This constitutional mandate prohibits courts from intervening in religious disputes involving doctrinal matters. Id. However, a court may accept jurisdiction and render a decision in religious controversies that are outside the doctrinal realm, such as those involving property and contractual rights. Id. To address the question of whether a court has jurisdiction to render a decision in a religious controversy, we must determine whether the court can resolve the dispute "without entangling itself in matters of doctrine, discipline, faith, or internal organization." Berthiaume v. McCormack, 153 N.H. 239, 245 (2006) (citing Presbyterian Church v. Hull Church, 393 U.S. 440, 449 (1969)).

We first addressed this question in Reardon. Reardon, 122 N.H. at 1047-50. There, the plaintiffs requested the trial court to issue four declarations construing the terms of their employment contracts with a Catholic school after the school board decided not to renew them. Id. at 1048. We concluded that two requested declarations did not "touch[] upon doctrinal matters" because they required the court to interpret only the terms and procedures set forth in the contracts, which were not based upon religious doctrine. Id. at 1048-49. We concluded that the plaintiffs' other two requested declarations, which

5

related to the sufficiency of the reasons for non-renewal, could only be considered by the court to the extent that the alleged reasons for non-renewal were secular — such as a failure to obtain State certification — rather than for doctrinal judgments that were "clearly beyond the judicial sphere of authority." Id. at 1049.

We next addressed this issue in Berthiaume, which involved a dispute between a church and its parishioners relating to the sale of church property. Berthiaume, 153 N.H. at 241-42. There, we recognized that "'[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.'" Id. at 244-45 (quoting Jones v. Wolf, 443 U.S. 595, 602 (1979)). The question we addressed in Berthiaume, therefore, was how the court may resolve such a dispute without "'inhibiting the free development of religious doctrine and . . . implicating secular interests in matters of purely ecclesiastical concern.'" Id. at 245 (quoting Presbyterian Church, 393 U.S. at 449). Because the United States Supreme Court left it to the states to adopt one of various approaches for settling church property disputes "'so long as it involves no consideration of doctrinal matters,'" id. at 248 (emphasis added) (quoting Jones, 443 U.S. at 602), we first considered only secular documents such as trusts, deeds, and statutes, and would only consider religious documents, such as church constitutions and bylaws, if the secular documents did not resolve the dispute. Id.

The Church's contempt motion here presents a very different situation. The contempt motion requests the trial court to hold the defendants in contempt for engaging in behavior that, according to the Church, is contrary to the central rulings in the 2016 order. However, unlike Reardon and Berthiaume, the trial court's rulings in the 2016 order did not resolve a civil dispute governed by New Hampshire laws. Cf. Berthiaume, 153 N.H. at 245 (property dispute); Reardon, 122 N.H. at 1048-49 (contract dispute). Rather, the trial court's rulings resolved an internal disagreement within the Church as to its leadership and membership based solely upon the court's interpretation of the procedures and conditions necessary to become a new member and pastor set forth in the corporate charter. As the language of these procedures and conditions makes clear, they are based upon the Church's religious doctrine, not secular law. Thus, in essence, the Church's contempt motion asks the court to hold Church members in contempt of court for acting contrary to its corporate charter and religious tenets. If the court were to hold Church members in contempt for engaging in actions that conflict with a religious document, the court would be interfering with the power of a religious organization to decide, "'free from state interference, matters of church government as well as those of faith and doctrine.'" Presbyterian Church, 393 U.S. at 448 (quoting Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116

6

(1952)).  Accordingly, we conclude that the trial court should have dismissed the Church's contempt motion for lack of jurisdiction.[2]

However, in its contempt order, the trial court issued additional rulings and asserted that these rulings "effectively resolve[] the issues raised" in the Church's complaint for declaratory and injunctive relief.  Specifically, the trial court concluded that the defendants' continued residence in the Church's parsonage was unlawful and required that the defendants pay the Church's property taxes and a monthly fine until they vacated the premises.  Additionally, the trial court ordered the defendants to turn over the corporate seal and all corporate records in their possession.  However, in so ruling, the trial court did not conduct the narrow inquiry required to properly resolve the church property disputes as necessary to avoid entangling itself in doctrinal matters.  See Berthiaume, 153 N.H. at 248.

---

[2] The defendants do not collaterally attack the 2016 order based upon lack of jurisdiction under the First Amendment.  See Porter v. Coco, 154 N.H. 353, 358 (2006) (explaining that a collateral attack on a prior judgment is permitted for lack of jurisdiction).  Indeed, the defendants initiated the underlying action.  Thus, we will not disturb that ruling.  However, we must comment on the fact that, in rendering a decision on the underlying action, the trial court ruled on a question that required the court to interpret, and endorse, a particular religious tenet.

Specifically, to determine whether the membership of Fuller and those individuals he invited to the Church, and his official actions as pastor, were void due to an alleged failure to comply with the Church's corporate charter, the court determined that the new members were accepted into the Church pursuant to the procedures set forth in the charter.  This inquiry included the court's determination that the new members had satisfied the charter's membership requirements by giving "testimony of their faith and [submitting to] baptism by immersion" and accepting the charter.  Thus, it was not possible for the court to determine whether the new members had met these requirements without "endorsing and therefore establishing a particular religious viewpoint while simultaneously impinging on the right of other individuals to practice their religious beliefs free from state interference." Rentz v. Werner, 232 P.3d 1169, 1178 (Wash. Ct. App. 2010) (collecting cases) (explaining that questions as to whether a church "has properly selected, retained, or terminated the services of a minister" or whether "a minister is in compliance with church rules are recognized as implicating the core of the church's ecclesiastical affairs," and that "[c]ontroversies over membership qualification and expulsion . . . present similar problems").

Moreover, when there was an inconsistency between the rules set forth in the charter and the facts, the trial court inserted its own judgment about whether such rules were actually required under the circumstances.  For example, although none of the new members had been examined or recommended by the Board of Elders — a membership requirement under the charter — the trial court concluded that, because the Church did not have a Board of Elders at the time, this requirement was waived.  This analysis plainly undermines "the general rule that religious controversies are not the proper subject of civil court inquiry." Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976) (concluding that an inquiry into a church's canonical or ecclesiastical procedures or the "substantive criteria" upon which the church decided an issue "is exactly the inquiry that the First Amendment prohibits"); Berthiaume, 153 N.H. at 245 ("But First Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.'" (quoting Presbyterian Church, 393 U.S. at 449)).

7

Based upon our directive in <u>Berthiaume</u>, the trial court should have first considered only secular documents such as trusts, deeds, and statutes.  <u>Id</u>.  If the secular documents left it unclear as to which party should prevail, only then could the trial court consider religious documents, such as church constitutions and by-laws, by applying neutral principles of law.  <u>Berthiaume</u>, 153 N.H. at 248; <u>Reardon</u>, 122 N.H. at 1048.  Therefore, to the extent that the trial court's order was intended to resolve the conflict over Church property described in the Church's complaint for declaratory judgment and injunctive relief, we vacate the court's order and remand for further proceedings consistent with this opinion and our case law.

In doing so, we note that a "civil court must accept the ecclesiastical decisions of church tribunals as it finds them."  <u>Serbian Orthodox Diocese v. Milivojevich</u>, 426 U.S. 696, 713 (1976).  It may not inquire "into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow" or "the substantive criteria by which they are supposedly to decide the ecclesiastical question."  <u>Id</u>.  Thus, if "a congregational church's internal property dispute cannot be resolved using neutral principles of law, the courts must . . . defer to the decisions 'by a majority of its members or by such other local organism as it may have instituted for the purposes of ecclesiastical government.'"  <u>Harris v. Matthews</u>, 643 S.E.2d 566, 570 (N.C. 2007) (quoting <u>Watson v. Jones</u>, 80 U.S. 679, 724 (1871)).  The court may not inquire into the validity of the procedures by which the Church reached that decision.  <u>See</u> <u>Milivojevich</u>, 426 U.S. at 713.

Finally, the trial court awarded attorney's fees and costs to the plaintiffs based upon the defendants' "direct contravention of both the letter and spirit of the [2016] order and the corporate charter."  Because the trial court lacked jurisdiction to consider the Church's contempt motion, the trial court necessarily also lacked jurisdiction to award attorney's fees and costs to the plaintiffs on that basis.

## III. Conclusion

Because the contempt motion fell outside of the court's jurisdiction, the trial court erred when it did not grant the defendants' motion to dismiss. Accordingly, we reverse the trial court's denial of the defendants' motion to dismiss.  To the extent that the trial court sought to resolve the Church's complaint for declaratory judgment and injunctive relief, we vacate the trial court's rulings on that matter and remand for proceedings consistent with this opinion.  We also reverse the trial court's award of attorney's fees and costs. All arguments the defendants raised in their notice of appeal, but did not brief, are deemed waived.  <u>In re Estate of King</u>, 149 N.H. 226, 230 (2003).

Reversed in part; vacated in part; and remanded.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.